IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAESANG CORPORATION,   :
  Plaintiff      :
           :
 v.         :   Civil No. AMD 03-551
           :
RHEE BROS., INC.,     :
  Defendant     :
        ...o0o...

MEMORANDUM OPINION SETTING FORTH FINDINGS OF FACT AND
CONCLUSIONS OF LAW PURSUANT TO FED.R.CIV.P. 52

In this action arising under the Lanham Act, 15 U.S.C. §§ 1051, et. seq., and state

law, plaintiff/counter-defendant Daesang Corporation ("Daesang"), seeks cancellation of a

federal trademark registration, consisting in relevant part of a Korean alphabet depiction

which transliterates to the term "Soon Chang" (hereinafter "the mark"), and damages under

Maryland law for tortious interference with business relations and prospective economic

advantage, against defendant/counter-plaintiff Rhee Bros., Inc. ("Rhee Bros."). In particular,

Daesang alleges that: (1) registration of the mark should be canceled because Rhee Bros.

obtained federal registration of the mark fraudulently; and that, alternatively, (2) the claim

to exclusive use of the mark is unenforceable because (a) it is geographically descriptive but

lacking in secondary meaning and (b) it is used in a manner that is geographically

deceptively misdescriptive. Rhee Bros. has asserted counterclaims for: (1) trademark

infringement; (2) unfair competition and false designation of origin in violation of 15 U.S.C.

§ 1125(a); (3) trademark dilution in violation of 15 U.S.C. § 1125(c); (4) common law

trademark infringement; and (5) unfair competition.

I conducted a bench trial over several days between January 18, 2005, and February 14, 2005. After careful consideration of the witness testimony, trial exhibits, and all the evidence presented, and after considering the arguments of counsel, I shall direct the entry of judgment in favor of Daesang as to its federal claims. However, I find and conclude that the state law claim is not proven. Furthermore, I do not find that this case qualifies as an "exceptional case" under section 35(a) of the Lanham Act, and thus I shall deny Daesang's request for costs and attorneys' fees. *See* 15 U.S.C. § 1117(a). Rhee Bros.'s counterclaims shall be rejected. There follows my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

I.     FINDINGS OF FACT

1.   "Gochujang" (also written as "gochuchang," "go choo chang," "kochujang" or "koch'ujang") is a Korean condiment or sauce commonly known in English as "hot pepper paste" or "hot bean paste." *Yu Dec. ¶ 1.*

2.   Gochujang is a very popular food among Koreans. *Kim-Renaud Dep. at 24* ("There is no Korean who would grow up not having eaten it.").

3.   By a wide margin, the primary purchasers of gochujang in the United States are persons of Korean origin.[1] *Cho Dep. at 19; Bae Dep. at 14.*

---

[1]In 1980, there were approximately 350,000 Korean Americans living in the United States, 290,000 of whom were born in Korea.  By the year 2000, there were approximately one million Koreans living in the United States, 700,000 of whom were born in Korea and immigrated to the United States prior to 1990. *Plf. Exhs. 210-17.*

4.  The Soon Chang province of South Korea has been well known for and associated with producing high quality gochujang for centuries. *Larsen Dec. ¶¶ 9, 15*; *Plf. Exhs. 125, 143, 147, 148, 155, 157*.

5.  Most Koreans and Korean Americans are, and have long been, familiar with the goods-place association between Soon Chang and gochujang; Rhee Bros.' contention that knowledge of the goods-place association between Soon Chang and gochujang is a result of recent efforts by, if not an invention of, the Korean government or the local Soon Chang government, is rejected.[2]

6.  During the Chosun Dynasty in Korea (1392-1910), Soon Chang gochujang was sent to Seoul, the capital of Korea, as a tribute to kings. *Larsen Dec. ¶¶ 9, 15*; *Plf. Exhs. 125, 143, 147, 148, 155, 157*.

7.  Numerous encyclopedias and historical documents confirm that as early as the 18th century, "one of the things that Sunch'ang is well known for is koch'ujang." *Larsen Dep. at 16-18, 37; Larsen Dec. ¶ 15*.

8.  In 1740, a Korean document known as *Sumunsasol* noted that Soon Chang was a place in Korea famous for high quality gochujang. *Larsen Dec. ¶ 15*.

9.  Another document from the early 1880s, the *Kyuhapch'ongso*, notes that of the places in Korea known for their gochujang, Soon Chang is the most famous. *Id.*

---

[2]Daesang introduced credible witness testimony by Korean and Korean American gochujang consumers confirming the goods-place association of Soon Chang gochujang. *Whan-Kee Kim Dep. at 22-23*; *Bae Dep. at 23*; *Cho Dep. at 8-9*; *Kil Yong Kim Dep. at 42, 56-64*; *Kil Yong Kim Dec. ¶¶ 6-7, 9*.

10.  A May 17, 1959, article in the *Chosun Daily Newspaper*, a Korean language paper, states in part:

> One of the famous products in Soon Chang is gochujang.  It is believed that the water here created today's "Soonchang Gochuchang" not to mention the culinary technique . . . . From ancient times high government officials who toured this district received a gochuchang jar as a gift and noble individuals who left this district received a gochuchang jar (as a souvenir).

*Plf. Exh. 3.*

11.  Consequently, numerous companies located in Soon Chang make gochujang and other sauces. *Yu Dec. ¶ 18.*

12.  Additionally, the local community operates a Gochujang Folk Village, which promotes the sale of gochujang made by local businesses.  *Yu Dec. ¶ 18.*

13.  Numerous Internet websites promote gochujang made in Soon Chang.  *Hitt Dec. ¶¶ 7-12.*

14.  Brochures published by Soon Chang County and various manufacturers of gochujang located in Soon Chang discuss the fame and reputation of that area as a source of gochujang.  *Plf. Exhs. 112, 112A-F, 113, 114, 115, 115A.*

15. Saying "Soon Chang gochujang" to people familiar with Korean culture is similar to saying "Idaho potatoes" or "Maine lobsters" to an American; each such term implies quality and authenticity. *Kim-Renaud Dec. ¶ 17.*

16.  Defendant Rhee Bros. is a closely held Maryland corporation owned by Syng Man Rhee and his relatives. *Plf. Exh. 102.*

17.   Rhee Bros.' principal business address is at 9505 Berger Road, Columbia, Maryland. *Plf. Exh. 102.*

18.   Rhee Bros. is primarily in the business of selling Asian food products, including gochujang, to Korean and other persons in the United States and it operates retail grocery stores in Maryland, Virginia, New York, and California. *Rhee Dec. ¶ 11.*

19.   Syng Man Rhee, founder of Rhee Bros., is a highly-educated Korean-born individual who immigrated to the United States in the 1970s and established one of the first businesses to import and distribute Korean food products in the United States. *Rhee Dec. ¶¶ 4,14.*

20.   Rhee Bros. was one of the first companies to use brand names and labels on the packaging of imported Asian foods.  *Tr. at 158.*[3]

21.   In 1978, Rhee Bros. began selling gochujang using the term "Soon Chang" in its brand name.  *Tr. at 158.*

22.   Rhee Bros. purchased its first gochujang products in the late 1970s from a firm known as Tobagi Soon Chang Company located in Soon Chang, South Korea. *Rhee Dep. at 84-85; Tr. at 151-52.*

23.   On July 2, 1986, Rhee Bros. filed Application Serial No. 73/607565 for the mark *Rhee Dec. ¶¶ 31,36.*

24.   In the 1986 application, Rhee Bros. represented to the Patent and Trademark Office ("PTO") that Soon Chang meant "pure spear." *Plf. Exh. 28.*

---

[3]Citations to trial transcripts are hereinafter referenced as "*Tr.*"

25.   Rhee Bros. made no mention in the 1986 application that there is a region of South Korea known as Soon Chang or that the region is famous for high quality gochujang in spite of Rhee Bros.' knowledge of the fact. *Id*.

26.   Mr. Rhee testified that he intended the term "Soon Chang" to transliterate to the term "pure spear" to denote the hot and sharp taste of gochujang, *Tr. at 122*, but I find this explanation wholly incredible.

27.   Mr. Rhee places a picture of a young lady to reinforce the meaning of his brand name ASSI (meaning "young woman" in Korean), yet he never used a picture of a spear to refer to "pure spear" on any of his Soon Chang products. *Tr. at 173-74*.

28.   Soon Chang cannot be understood to mean "pure spear" in the Korean language because of the linguistic structure of the phrase Soon Chang in the Korea alphabet. *Kim-Renaud Dec. ¶¶ 3,8*.

29.   Although the mark literally translates in the Korean alphabet to the separate words "pure" and "spear," there is no association in the Korean alphabet or Korean culture between the words "pure" and "spear" that would make "pure spear" a plausible interpretation of the phrase "Soon Chang" by a person who reads the term in Korean or is familiar with Korean culture, which is essentially the community of consumers to whom gochujang is marketed, in the Korean language, in the United States. *See id. at ¶¶ 8-9*.[4]

---

[4]At trial, the Korean language interpreter could not translate the oral testimony, in the Korea language, of the term "Soon Chang" into "pure spear" as a plausible English translation.

30.  On December 8, 1987, Rhee Bros. obtained registration for the mark, Reg. No. 1,468,524, for the term "Soon Chang" in the Korean alphabet. *Rhee Dec. ¶¶ 31,36.*

31.  In early 1994, the mark was canceled by the PTO for failure of Rhee Bros.' attorney to file a Section 8 affidavit. *Id. at ¶ 39.*

32.  The cancellation was not based on the merits of Rhee Bros.' registration, and Rhee Bros. had continuously used the mark in commerce from 1978 through the date of cancellation in 1994. *Id.*

33.  On April 13, 1994, Rhee Bros.' attorney filed Application Serial No. 74/511883 for the mark ("Amberly application"). *Rhee Dec. ¶ 43; Def. Exh. 85.*

34.  On June 26, 1995, a non-final office action was mailed to Amberly stating that the mark is descriptive and the mark was not categorized as geographic. *Def. Exh. 83.*

35.  On February 23, 1996, the application was deemed abandoned for failure of the applicant to respond to the office action. *Rhee Dec. ¶ 45; Def. Exhs. 83, 84.*

36.  On February 26, 1996, Amberly responded to an oral notice of abandonment by filing a request for reinstatement based on his failure to receive the June 1995 office action. *Def. Exh. 4.*

37.  On July 8, 1996, the PTO requested additional information explaining the reason for non-receipt of the office action. *Def. Exhs. 4,83.*

38.  On August 27, 1996, another Rhee Bros. attorney filed Application Serial No. 75/157052 for the mark ("Ahn application"). *Rhee Dec. ¶ 49.*

39.  A different examiner was assigned by the PTO to the Ahn application. *Koh Dep. at 64-65.*

40.  On August 28, 1996, Amberly filed a response and another change of address, informing the PTO that he was not receiving mail at his previous address. *Def. Exh. 81.*

41.  On September 26, 1996, the PTO dismissed the Amberly application for failure to respond. *Def. Exhs. 80, 81.*

42.  On October 3, 1996, Amberly filed another request for reinstatement. *Def. Exhs. 80, 81.*

43.  On December 13, 1996, Amberly's request for reinstatement was granted. *Def. Exhs. 80, 81.*

44.  On July 30, 1997, Ahn filed a response to an office action which included an affidavit from Rhee Bros. stating that Soon Chang is the name of a town located in South Korea. *Rhee Dec. ¶ 51*; *Def. Exh. 72.*

45.  On September 19, 1997, Amberly responded to an office action and stated that Soon Chang is a region in Korea that is "famous for sauces," but that there is no goods-place association for the mark in the U.S. *Koh Dep. at 59-60; Plf. Exh. 33, Application Serial Number 74/511883.*

46.  Despite Rhee Bros.' denial (or material omission in the case of the Ahn application) that Soon Chang possesses a goods-place association (in the minds of those in the relevant American consuming community) with gochujang, Rhee Bros. emphasizes the historical connection by displaying a phrase on its labels and advertisements that reads,

"Soon Chang, the historical traditional way of the past, the way it was before," and emphasizes the "hometown" taste of Soon Chang gochujang. *Plf. Exhs. 99, 100; Kim-Renaud Dec. ¶ 18*.

47.  The Ahn application was approved for publication on November 7, 1997. *Def. Exh. 72*.

48.  On October 28, 1997, in a non-final office action, the PTO refused to register the mark pursuant to the Amberly application because the mark was found to be primarily geographically deceptively misdescriptive. The PTO requested that Rhee Bros. submit evidence of secondary meaning, which Rhee Bros. never did. *Plf. Exh. 34; Koh Dep. at 62-63*; *Def. Exh. 76*.

49.  Rhee Bros. obtained Registration No. 2,140,224, issued March 3, 1998 (via the Ahn application) for the Korean characters transliterating to "Soon Chang Chap Sal and Gochujang," meaning "Soon Chang Sweet Rice Hot Bean Paste" (the latter part of which was disclaimed). *Plf. Exh. 30*. This is the registration being by challenged by Daesang in the case *sub judice*.

50.  On July 15, 1998, the Amberly application was canceled for failure to respond to the October 28, 1997, office action and request for secondary meaning evidence, *Def. Exhs. 4, 76*, which could not have been demonstrated in any event.

51.  Rhee Bros.' mark is not listed among the brands used by Rhee Bros. on its web site or in any of its company brochures. *Plf. Exhs. 27, 58, 59, 102*.

52.  The term "Soon Chang" (in English or Korean) does not appear in any of Rhee Bros.' brochures or on its website. *Tr. at 67-74.*

53.  Rhee Bros. used its ASSI trademark on the first gochujang that it sold and still uses the ASSI brand name, as well as the Yssine brand name, on most of the Rhee Bros. gochujang products. *Rhee Dep. at 46-47; Koh Dep. at 39; Plf. Exh. 31, Response to Requests for Admissions No. 20.*

54.  Although Rhee Bros. displays the registration symbol ® next to the ASSI mark, and the ™ symbol next to the Yssine brand, it has never displayed the ® or ™ symbols adjacent to the term "Soon Chang." *Plf. Exh. 31, Response to Requests for Admissions, Nos. 13-16.*

55.  Until a few months prior to trial, Rhee Bros. was not importing its gochujang from Soon Chang, South Korea. *Plf. Exh. 31, Response to Request for Admissions, No. 19.*

56.  Daesang is a Korean corporation, which maintains a place of business at 52-I Kayang-dong, Kangseo-ku, Seoul, Korea.  *Yu Dec. ¶ 1.*

57.  Daesang sells a variety of food products in the United States, including gochujang. *Yu Dec. ¶ 1.*

58.  The gochujang sold by Daesang and its predecessor Miwon Co. Ltd. (which merged with Daesang in 1997) is supplied by Daesang Food Co., Ltd. (formerly known as Hwa Young Foods).  *Yu Dec. ¶ 3.*

59.  Daesang's gochujang is made in the Soon Change province of South Korea. *Yu Dec. ¶ 3.*

60.  Since at least as early as 1992, Daesang and its predecessor Miwon have sold gochujang continuously in the United States under the house marks Imgumnimpyo or ChungJungWon.  *Yu Dec. ¶¶ 5-7*.

61.  To indicate the geographical origin of the products, the gochujang labels display the Korean characters that transliterate to Soon Chang.  *Yu Dec. ¶¶ 5-7*.

62.   Daesang's products are publicized in advertisements in Korean language newspapers and commercials broadcast on Korean language television stations in New York and Los Angeles.  *Do Dec. ¶ 8*.

63.  Rhee Bros. had knowledge of the use of the term "Soon Chang" by Daesang's predecessor, Miwon, since at least 1993 when Rhee Bros. unsuccessfully attempted to persuade Miwon to pay Rhee Bros. a royalty to use the term "Soon Chang."  *Rhee Dep. at 137-38*.

64.  A royalty agreement was never realized and there has never been any litigation between Miwon or Daesang and Rhee Bros. prior to this litigation.  *Rhee Dep. at 101-02*.

65.  In 1994, Rhee Bros. sent a letter to Miwon's distributor complaining about Miwon's use of the term "Soon Chang."  *Plf. Exh. 41; Yu Dec. ¶¶ 28, 34*.

66.  Rhee Bros. sent another letter to Daesang and Hwa Young Food Co. in 1997 through Daesang's U.S. distributor P.K. Trading, Inc.  *Plf. Exh. 42, Yu Dec. ¶ 34*.

67.  In 2001, Rhee Bros. filed a trademark infringement suit in this court, Civil Action No. 01-CV-1894-AMD, to challenge the use of the term "Soon Chang" by Daesang's customer, the Korean grocery store chain Han Ah Reum.  *Rhee Dep. at 110-11*.

68.  The suit was based on Rhee Bros.' 1998 trademark registration No. 2,140,224 (a product of the Ahn application).  *Rhee Dep. at 110-11.*

69.  After Rhee Bros. filed suit against Han Ah Reum, Han Ah Reum stopped purchasing Daesang's gochujang from Daesang's U.S. importer, C. Kenneth Imports.  *Yu Dec. ¶ 38; Kil Yong Kim Dec. ¶ 11.*

70.  In respect to the lawsuit Rhee Bros. filed against Han Ah Reum, a Consent Decree and Settlement Agreement was entered requiring, *inter alia*, that Han Ah Reum send letters, in English and Korean, to all of its retail outlets ordering them to stop selling all products of third parties bearing the name "Soon Chang Chapssal (or Chal) Gochujang." *Plf. Exh. 75.*

71.  Although there are several types of gochujang, the 2001 settlement agreement prohibits only the sale of Soon Chang Chapssal and Chal gochujang.  *Koh Dep. at 37-40; Plf. Exh. 35.*

72.  Rhee Bros. has never disputed the limitation in the instructions given by Han Ah Reum to its employees.  *Tr. at 19-22.*

73.  In 1996, Daesang acquired a partial ownership interest in Hwa Young Foods (now called Daesang Foods Co. Ltd.).  *Yu Dec. ¶ 49.*

74.  In 1996, Hwa Young Foods  applied for a trademark for the term "Soon Chang." *Plf. Exh. 66.*

75. Despite the Amberly application's affirmative statement that Soon Chang did not have a goods-place association, and the Ahn application's silence on the issue, Rhee Bros.

filed a letter of protest in September 1996 in connection with Hwa Young Foods' trademark application, protesting that the mark was identical to the mark Rhee Bros. was attempting to register. *Plf. Exh. 66*.

76. In its protest, Rhee Bros. admitted that the term Soon Chang is geographically descriptive and "the public association with Soon Chang is presumed." *Plf. Exh. 66*.

77. Nevertheless, Daesang Food Company Ltd. obtained U.S. Trademark Reg. No. 2,297,191, issued under its former name, Hwa Young Foods, on December 7, 1999, for the mark containing Korean characters that transliterate to Soon Chang. *Yu Dec. ¶ 45*.

78. Daesang Food Company Ltd. also owns U.S. trademark Reg. No. 2,270,076, issued August 17, 1999, for the mark containing Korean characters that transliterate to "Imgumnimpyo," "SoonChang," "mubangble," and "musakso" meaning "King  mark," "SoonChang," "no antiseptic," and "no food colors," respectively. *Yu Dec. ¶¶ 42-43*.

79. On March 16, 2004, Daesang Food Company Ltd. filed a mark disclaimer on "Soon Chang" shortly after Rhee Bros. served Requests for Admissions in this litigation asking Daesang to admit that Hwa Young Foods did not disclaim rights in Soon Chang in that registration. *Def. Exh. 10*.

80. Several companies in addition to Daesang sell gochujang in the United States under labels bearing the Korean alphabet for Soon Chang. *Plf. Exhs. 112, 112A-F, 113, 114, 115, 115A*.

81. For example, on February 28, 2004, at the Garden Market in Closter, New Jersey, the following products were being offered for sale, all of which bore the Korean alphabet for

Soon Chang on the label: Hanmi Wang Soon Chang Gochujang, ChungJungWon Soon Chang Chal Gochujang, Assi Soon Chang Chapssal Gochujang (made by Rhee Bros.). "Hanmi Wang," "ChungJungWon" and "Assi" are brand names, "Chapssal" means "glutinous rice," and "Chal" means "sticky." If hot bean paste (gochujang) is made from glutinous rice (chapssal) it is always sticky (chal). *Yu Dec. ¶¶ 24-25.*

82. On February 28, 2004, at the Han Ah Reum grocery store in Little Ferry, New Jersey, the following products were being offered for sale, all of which bore the Korean characters "Soon Chang" on the label: Hanmi Wang Soon Chang Chapssal Gochujang, Hyundai Soon Chang Matgal Gochujang, ChungJungWon Soon Chang Gowoonbit Soonhan Gochujang, ChungJungWon Soon Chang Gowoonbit Maewoon Gochujang, ChungJungWon Soon Chang Myungpoom Gochujang, ChungJung Won Soon Chang Cho Gochujang. "Hanmi Wang," "Hyundai," and "ChungJungWon" are brand names. "Matgal" means "tasteful," "Bokkum" means "fried," "Gowoonbit" means "bright color," "Soonhan" means "mild," "Maewoon" means "hot," "Myungpoom" means "prestigious brand," and "Cho" means "vinagered or sour." *Id. at ¶¶ 26-27.*

83. In April 2004, the following products with "Soon Chang" on the label were offered for sale in various stores in the Maryland-Virginia area: Wang Soon Chang Hot Pepper Paste, Hyundae Food Soon Chang Hot Pepper Paste, and Choripdong Soon Chang Hot Pepper Paste. *Plf. Exhs. 8-10.*

84. There were also many Daesang Soon Chang gochujang products for sale in various stores, including Han Ah Reum. *Plaint. Exhs. 11-17; Hitt Dec. ¶¶ 1-5.*

85.   Immediately prior to trial, in December 2004, Daesang once again found many of the same and other third party gochujang products with "Soon Chang" on the labels for sale in stores, including stores within a few miles of Rhee Bros.' Columbia, Maryland headquarters. *Hitt Dec. ¶¶ 12-19.* These brands include Wang, Tobagi, and Hyundae Soon Chang gochujang products as well as many Daesang Soon Chang products. *Id.*

86.   Three other companies, Samyang, Hwagae, and Hanmi, use the term "Soon Chang" in the name of their products. *Bae Dep. at 18-19.*

87.   Samyang and Hwage have sold Soon Chang gochujang in the United States for approximately ten years, and Hanmi for about four to five years. All three are still selling gochujang using "Soon Chang" as part of the name. *Id. at 19-20.*

88.   Rhee Bros. has knowledge as to the extensive third party use of the term "Soon Chang" on gochujang product labels. *Rhee Dep. at 61-62*; *Bae Dep. at 16-17.*

89.   Rhee Bros. has not taken any legal action against any of these third parties. *Koh Dep. at 139-77*; *Tr. at 42-43.*

II.   CONCLUSIONS OF LAW

This court has jurisdiction over the subject matter under § 39 of the Trademark Act of 1946, 15 U.S.C. § 1121 and under 28 U.S.C. §§ 1331, 332, 1338, and 1367. Venue is proper in this district and this division under 28 U.S.C. § 1391.

A.     Rhee Bros.' Trademark Registration Containing the Term "Soon Chang" was
       Fraudulently Obtained, is Geographically Descriptive but Lacks Secondary
       Meaning, and is Geographically Deceptively Misdescriptive[5]

    1.     Rhee Bros. Fraudulently Obtained its Trademark Containing the Term
           "Soon Chang"

A trademark is any word, name, symbol, or device that identifies and distinguishes

the goods of one manufacturer or merchant from those of others. *See* 15 U.S.C. § 1127.   A

geographically descriptive term is one in which the primary significance attached to the term

is a generally known geographic location. *See Burke-Parsons-Bowlby Corp. v. Appalachian*

*Log Homes, Inc.*, 871 F.2d 590, 595 (6th Cir. 1989) ("The Legislative History of the Lanham

Act points out that where a logical connection can be made between the product and the

geographical term, the term is geographically descriptive.").   A geographically descriptive

term is not inherently distinctive, and thus cannot receive trademark protection unless it has

achieved secondary meaning. *Id.* (noting that the term 'Appalachian' refers to a particular

style of log structures and thus is geographically descriptive).

Secondary meaning exists when the public no longer associates the goods with a

particular place, but rather with a particular source.  *Resorts of Pinehurst, Inc. v. Pinehurst*

*Nat'l Corp.*, 148 F.3d 417, 421 (4th Cir. 1998); *Boston Beer Co. Ltd. P'ship v. Slesar Bros.*

*Brewing Co., Inc.*, 9 F.3d 175, 181 (1st Cir. 1993) (rejecting a claim of secondary meaning

for 'Boston beer' because most consumers connected the term with beer brewed in Boston).

Therefore, if a geographically descriptive term that lacks secondary meaning is trademarked

---

[5]In view of the findings and conclusions set forth herein, I need not address the issue of
abandonment.

as a result of the applicant's failure to reveal the geographical description to the PTO, or if the applicant makes a material misrepresentation of the term's definition, the trademark registration has been procured by fraud and may be canceled at any time. *See* 15 U.S.C. § 1064(3); *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986) (defining fraud in the procurement of a trademark registration when the applicant knowingly makes false, material representations of fact in connection with his application) (citations omitted). Fraud in the procurement of a trademark registration provides grounds for cancellation in a civil action. *See Robi v. Five Platters, Inc.*, 918 F.2d 1439, 1444 (9th Cir. 1990) (affirming the district court's finding that defendant had submitted a false and misleading trademark application, resulting in the cancellation of the trademark based on fraud in the procurement); 15 U.S.C. § 1120.

It is well established that an applicant for a registration of a trademark has a duty of candor in his communications with the PTO. *T.A.D. Avanti, Inc. v. Phone-Mate, Inc.*, 199 U.S.P.Q. 648, 655 (C.D. Cal. 1978); *see also Aromatique, Inc. v. Gold Seal, Inc.*, 28 F.3d 863, 877 (8th Cir. 1994) (an applicant for a registration owes a "duty of candor" to the PTO); *Orient Express Trading Co., Ltd. v. Federated Dept. Stores*, *Inc.*, 842 F.2d 650, 653 (2nd Cir. 1988) (applicant has a duty of "uncompromising candor" to the PTO). Consequently, there is no presumption of validity attached to a PTO registration where pertinent information is not presented to the PTO. *T.A.D. Avanti*, 199 U.S.P.Q. at 655. Fraud arises, therefore, not only where the applicant makes false statements, which is clear with respect to Rhee Bros.'

1987 trademark registration, but also where the applicant fails to make full disclosure of all material facts, which is clear with respect to the later registration.

In its first trademark application in 1986, Rhee Bros. did not inform the PTO of Soon Chang's geographical identity nor did it mention Soon Chang's association with high quality gochujang. Instead, Rhee Bros. represented that Soon Chang meant "pure spear." Daesang's unrebutted expert witness testimony, fully credited here, and Mr. Rhee's demonstrated knowledge at the time, of Soon Chang's fame for high quality gochujang, make clear that "pure spear" is not only grammatically and syntactically incorrect, but also affirmatively misleading as to  Soon Chang's goods-place association with gochujang.[6] Although Rhee Bros.' 1987 trademark registration, which was canceled in 1994 due to Rhee Bros.' failure to file a Section 8 affidavit, is not the trademark at issue in the instant case, the context in which it was obtained is highly probative of the fraudulent circumstances surrounding the registration of the instant trademark.

It is clear from the evidence presented at trial that Soon Chang is, and has been for centuries, famous for its high quality gochujang among Korean consumers, and that Rhee Bros. knew this at all relevant times. The primary purchasers of gochujang in the United

---

[6]Mr. Rhee testified at trial that he was aware as far back as the late 1970s, when he first began selling gochujang, of a gochujang manufacturing company called Tobaki Soon Chang Sikpum located in Soon Chang, South Korea.  *Tr.* at 151-52.

States, by orders of magnitude, are persons of Korean origin, and as far back as 1978, Rhee

Bros. had knowledge of Soon Chang's fame for high quality gochujang.[7]

Mr. Rhee's testimony lacks credibility with regard to his alleged ignorance of Soon

Chang's fame for high quality gochujang at the time he applied for the instant trademark in

1996. The fact that Rhee Bros. filed a letter of protest in September 1996 with the PTO in

connection with Daesang's trademark applications for a mark with the term "Soon Chang"

establishes Rhee Bros.' knowledge of the goods-place association between Soon Chang and

gochujang. The letter claimed that Daesang's mark was not only identical to the mark Rhee

Bros. was attempting to register, but that the term Soon Chang is geographically descriptive

and "the public association with Soon Chang is presumed." *Plf. Exh. 66*. Rhee Bros.'

September 1996 letter of protest was filed a full year prior to the Ahn application, in which

Rhee Bros. admitted that Soon Chang is the name of a town in Korea and thereby materially

omitted disclosure of the goods-place association between Soon Chang and gochujang. It is

at best disingenuous for Rhee Bros. to admit this material information in connection with its

challenge to a competitor's attempts at trademarking Soon Chang, only to claim ignorance

of the fact as to Soon Chang's geographical descriptiveness in its own trademark application.

Rhee Bros. did indeed have knowledge of Soon Chang's geographical descriptiveness

at the time of its initial application with the PTO in August 1996 for the mark *sub judice*.

---

[7]Mr. Rhee's trial testimony, Rhee Bros.' advertisements that emphasize Soon Chang's traditional way of producing gochujang, and Mr. Rhee's direct reliance on a book describing the 35 year history of Korean bean paste, constitute compelling evidence of Rhee Bros.' timely knowledge of Soon Chang's fame for high quality gochujang.

Furthermore, Mr. Rhee was cognizant of his lawyers' representations in the trademark applications. The Amberly application filed in 1994 made absolutely no mention of Soon Chang's geographical identity as a province in South Korea or of the goods-place association between Soon Chang and high quality gochujang until September 1997, when Amberly stated that Soon Chang is a region in South Korea that is famous for sauces.  However, Amberly affirmatively stated that there is no goods-place association for the mark in the U.S. despite the fact that a majority of U.S. consumers are of Korean origin and indeed are familiar with Soon Chang's reputation for gochujang.

The Ahn application, which resulted in the instant mark, stated in July 1997 that Soon Chang is the name of a town located in Korea, but did not mention Soon Chang's fame for high quality gochujang. This material omission, in combination with all the evidence in the record, points to Rhee Bros.' fraudulent intent in concealing this highly relevant information from the PTO. *See Aromatique,*, 28 F.3d at 877-78 (noting that proof of false statements made to, or that facts were withheld from, the PTO is not enough to show fraud for purposes of canceling a mark because of a party's fraudulent conduct, but rather there must be a showing that the applicant intended to mislead the PTO); *Orient Express Trading*, 842 F.2d at 653 (noting that the allegedly fraudulent statements may not be made in mere error or inadvertently, but must indicate a "deliberate attempt to mislead the PTO") (citing *The*

*Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666, 670 (7th Cir. 1982)). In this case there was no "mere error."[8]

Given the plethora of evidence establishing Soon Chang's fame for high quality gochujang and Rhee Bros.' knowledge of such, Rhee Bros.' duty of candor with regard to the instant trademark clearly included a duty to disclose the goods-place association between Soon Chang and gochujang. Merely stating that Soon Chang is a town in Korea is simply insufficient to satisfy Rhee Bros.' duty to make a full disclosure as to all relevant facts of which it had knowledge bearing on the PTO's decision to grant the registration. *See T.A.D.*, 199 U.S.P.Q. at 656. Had Rhee Bros. disclosed the material fact of Soon Chang's fame for gochujang and that Rhee Bros.' gochujang was not produced in Soon Chang, the PTO would certainly have denied the registration on the ground that this association rendered the mark deceptive and primarily geographically deceptively misdescriptive. *See Robi*, 918 F.2d at 1444 (submission of false affidavit to the PTO by applicant is grounds for cancellation of a trademark registration); *Skippy, Inc. v. CPC Int'l, Inc.*, 674 F.2d 209, 216 (4th Cir. 1982) (same).

    2.    Rhee Bros. Has Not Met Its Burden of Showing Secondary Meaning for the Geographically Descriptive Term "Soon Chang"

Even if I were to find that Rhee Bros. did not obtain the instant trademark by actual fraud, Rhee Bros. nevertheless has failed to show secondary meaning in the otherwise unprotected geographically descriptive term "Soon Chang." Because Soon Chang is not

---

[8]Tellingly, neither of the lawyers who represented Rhee Bros. in procuring the registrations of the mark was called as a witness by Rhee Bros.

inherently distinctive, the law requires that Rhee Bros. achieve secondary meaning to qualify

for legal protection. *Resorts of Pinehurst*, 148 F.3d at 421 (defining secondary meaning as

the public's association of the goods with a particular source as opposed to a particular

place). A geographically descriptive term lacks secondary meaning if it still primarily

denotes a geographic area, as opposed to a single source. *Burke-Parsons-Bowlby*, 871 F.2d

at 595.

"Proof of secondary meaning entails vigorous evidentiary requirements." *Perini Corp.*

*v. Perini Construction, Inc.*, 915 F.2d 121, 125 (4th Cir. 1990) (quoting *Thompson Medical*

*Co., Inc. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir. 1985)). In order to establish secondary

meaning in a geographically descriptive term like "Soon Chang," Rhee Bros. must produce

evidence that it has used the name substantially exclusively so that the public no longer

associates the goods with a particular place, but rather with a particular source. *Resorts of*

*Pinehurst*, 148 F.3d at 421. The Fourth Circuit considers the following factors in

determining whether secondary meaning exists: (1) advertising expenditures; (2) consumer

studies linking the mark to a source; (3) sales success; (4) unsolicited media coverage of the

product; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the mark's

use. *U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 525 (4th Cir. 2002); *Perini*,

915 F.2d at 125.

Rhee Bros. produced scant evidence of advertising expenditures, no consumer

surveys, no evidence of unsolicited media coverage, and no indication that it has ever used

a ™ or ® symbols with the term "Soon Chang." Accordingly, I conclude that Rhee Bros.

failed to meet the requisite evidentiary standard to support a finding that its continuous production of gochujang using the term "Soon Chang" has established secondary meaning, thus replacing any pre-existing goods-place association among the relevant community of U.S. consumers.

>3.    The Use of Soon Chang on Rhee Bros. Products is Deceptive and Geographically Deceptively Misdescriptive

For the above reasons, Rhee Bros.' trademark in "Soon Chang" shall be canceled because the term, as used on Rhee Bros.' products, has been deceptive and geographically deceptively misdescriptive. Words used deceptively on labels or packaging are not subject to trademark protection under the common law or by statute. *Clinton E. Worden & Co. v. California Fig Syrup Co.*, 187 U.S. 516, 528 (1903); 15 U.S.C. §§ 1052(a), 1052(e)(3). A mark that affirmatively deceives consumers is deceptive and is not entitled to protection. 15 U.S.C. 1052(a); *In re California Innovations, Inc.*, 329 F.3d 1334, 1336 (Fed. Cir. 2003).

A mark consists of, or comprises, deceptive matter where: (1) the term is misdescriptive of the character, quality, function, composition, or use of the goods; (2) prospective purchasers are likely to believe that the misdescription actually describes the goods; and (3) the misdescription is likely to affect the decision to purchase. *In re Budge Mfg. Co., Inc.*, 857 F.2d 773, 775 (Fed. Cir. 1988). Deceptive trademarks which are registered may be canceled at any time. 15 U.S.C. 1064(3); *Am. Speech-Language-Hearing Ass'n v. Nat'l Hearing Aid Soc'y*, 224 U.S.P.Q. 798, 808-11 (T.T.A.B. 1984) (registration canceled under § 2(a)). Similarly, a mark is geographically deceptively misdescriptive if it

satisfies three factors: (1) the primary significance of the mark must be a generally known geographic location; (2) the consuming public must be likely to believe the place identified by the mark indicates the origin of the goods bearing the mark, when in fact the goods do not come from that place; and (3) the misrepresentation is a material factor in the purchasing decision. *California Innovations*, 329 F.3d at 1341-42.

Examples of deceptive trademarks include LOVEE LAMB used to describe automobile seat covers made from synthetic fibers and SILKEASE for women's blouses made from polyester. In both cases, the courts held the trademarks to be deceptive because they falsely implied the product was made from lamb or sheepskin or silk, respectively. *Budge Mfg.*, 857 F.2d at 775; *In re Shapely, Inc.*, 231 U.S.P.Q. 72, 75 (T.T.A.B. 1986) ("an appreciable number of women would be apt to believe the representation that appellant's garments are made, at least, in part of silk fibers").

In the case *sub judice*, the evidence demonstrates that Soon Chang is a geographical region in Korea. Like "Maine lobsters" or "Sheffield steel," "Soon Chang gochujang" has long been known as a product having certain qualities and characteristics affected by the climate, ingredients, and other conditions found in that part of Korea. Daesang's experts, as well as Mr. Rhee himself, admitted that Soon Chang has been renowned for its high quality gochujang for centuries. Therefore, use of the tem "Soon Chang" on a label for gochujang evokes in the mind of the relevant consumers images of the region in Korea and suggests that the gochujang is of a certain quality. Advertisements and packaging for Rhee Bros. gochujang specifically reference the history and fame of Soon Chang, Korea.

Rhee Bros.' gochujang is not produced in Soon Chang.[9]  Accordingly, consumers are likely to be misled by the deceptive use of Soon Chang on Rhee Bros.' labels for gochujang, and that deception is likely to affect the purchasing decisions of consumers. Consequently, Rhee Bros. is not entitled to trademark protection for the term "Soon Chang." *California Fig Syrup*, 187 U.S. at 528 ("Where any symbol or label claimed as a trade-mark is so constructed or worded as to make or contain a distinct assertion which is false, no property can be claimed on it, or, in other words, the right to the exclusive use of it cannot be maintained.").

      B.      Rhee Bros. Is Not Liable for Tortious Interference With Daesang's Business Relations and Prospective Economic Advantage

In Maryland, a claim for tortious interference with business relations arises from a defendant's wrongful and unjustified interference with another's contract or economic relations. "[A] third party who, without legal justification, intentionally interferes with the rights of a party to a contract, or induces a breach thereof, is liable in tort to the injured contracting party." *Wilmington Trust Co. v. Clark*, 424 A.2d 744, 754 (Md. 1981).  A third party can also be held liable where, "absent a breach of contract, there is malicious or wrongful interference with an economic relationship." *Ronald M. Sharrow, Chartered v. State Farm Mutl. Auto. Ins. Co.*, 511 A.2d 492, 497 (Md. 1986).  The term "economic relationship" includes a non-contractual business relation or prospective contractual relation.

---

[9]Although Rhee Bros. admits its gochujang was not imported from Soon Chang in past years, the company recently began importing its gochujang from Soon Chang only months before the trial. Such a litigation tactic does not negate the fact that Rhee Bros.' gochujang, for the most part, is not produced in Soon Chang.

*See Natural Design, Inc. v. Rouse Co.*, 485 A.2d 663, 674 (Md. 1984) (determining that a landlord-defendant's threats to stop dealing with two manufacturers who had dealt with the tenant-plaintiff resulted in the manufacturers' cessation of doing business with the plaintiff and thus constituted a tortious interference with economic relations).

To establish a claim for tortious interference with economic relationship, a plaintiff must "prove both a tortious intent and improper or wrongful conduct." *Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119 (Md. 1994); *see Audio Visual Assocs., Inc. v. Sharp Elec. Corp.*, 210 F.3d 254, 261 (4th Cir. 2000) (requiring intentional and wilful acts calculated to cause damage to the plaintiffs in their lawful business done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants and actual damage and loss resulting) (citing *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269 (Md. 1994)). A plaintiff may prove tortious intent by showing that the defendant intentionally induced termination of the economic relation to inflict harm on the plaintiff or to benefit the defendant at the plaintiff's expense. *Macklin*, 639 A.2d at 119. Improper or wrongful conduct may also be established by showing that the defendant instituted or threatened groundless civil suits in bad faith. *Id*. To be actionable, the wrongful conduct must cause the destruction of the business relationship which was the target of the interference. *Medical Mutual Liability Soc. of Md. v. B. Dixon Evander and Assocs., Inc.*, 660 A.2d 433, 439 (Md. 1994).

Daesang's tortious interference claim arises out of Rhee Bros.' efforts in 2001 to enforce the mark at issue against Seoul Shik Poom and Han Ah Reum, major distributors of

Daesang's gochujang products.  A trademark holder has the right to defend itself against infringement and to warn purchasers from the alleged infringer so as to caution the purchasers as to their own liability. *Spangler Candy Co. v. Crystal Pure Candy Co.*, 235 F.Supp. 18, 32 (N.D. Ill. 1964); *see U.S. Galvanizing & Plating Equip. Corp. v. Hanson-Van Winkle-Munning Co.*, 104 F.2d 856, 862 (4th Cir. 1939) (sending out notices of patent infringement in good faith and without intent to harass plaintiff's customers could hardly be said to be unfair competition). The trademark holder's right to warn others of infringement suits is not dependent on the validity of the trademark so long as the holder believes in good faith that his claims are valid. *Spangler Candy*, 235 F.Supp. at 33.  As a result, numerous courts have routinely rejected tortious interference and unfair competition claims based on good faith efforts to enforce intellectual property rights.[10] Therefore, the determinative question before this court is whether Daesang has established by a preponderance of the evidence that Rhee Bros. doubted the validity of its trademark, and thus acted in bad faith in filing suit against Seoul Han Ah Reum.[11] Additionally, Daesang must prove that Rhee

---

[10]*See Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft*, 189 F.Supp.2d 385, 390-91 (E.D. Va. 2002); *Kemp v. Tyson Foods, Inc.*, No. CIV 96-173 JRT/RLE, 2001 WL 391552, at *7 (D.Minn. March 31, 2001); *Am. Broad Co. v. Maljack Prods., Inc.*, 34 F.Supp.2d 665, 673-76 (N.D. Ill. 1998); *Golden Gulf Corp. v. Jordache Enters., Inc.*, 896 F.Supp. 337, 340 (S.D.N.Y. 1995); *Heinz v. Frank Lloyd Wright Found.*, 762 F.Supp. 804, 807-08 (N.D. Ill. 1991); *Blue Cross & Blue Shield Ass'n v. Group Hospitalization & Med. Servs., Inc.*, 744 F.Supp. 700, 718 (E.D. Va. 1990); *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F.Supp. 707, 720 (S.D.N.Y. 1973); *see also On Command Video Corp. v. Columbia Pictures Indus., Inc.*, 764 F.Supp. 1372, 1374 (N.D. Cal. 1991) (noting that "[c]ourts routinely uphold good faith notifications to nonparties of intellectual property claims").

[11]Daesang limits its claim for tortious interference as it relates to the economic activity between itself and Han Ah Reum.

Bros.' trademark enforcement suit caused the destruction of, or compensable harm to, the business relationship between Daesang and Han Ah Reum.

As explained below, I conclude that Daesang has not established by a preponderance of the evidence that Rhee Bros. acted tortiously in filing its trademark infringement suit against Han Ah Reum. Moreover, it was Han Ah Reum's independent decision to settle with Rhee Bros., as well as Daesang's failure to timely intervene in the suit, as opposed to Rhee Bros.' attempts to enforce its mark, that caused harm to Daesang's economic relations with Han Ah Reum. Thus, Daesang's tortious interference claim fails.

At the time of the suit against Han Ah Reum in 2001, Rhee Bros. had owned the instant mark for three years. Prior to the registration of the mark, Rhee Bros. owned an identical mark from 1987 until 1994.  Rhee Bros. was one of the first companies to use brand names and labels on the packaging of imported foods, which included the term Soon Chang on its gochujang products dating as far back as 1978. Daesang's evidence of competitor use of Soon Chang on gochujang labels dates back to the early 1990s.  Therefore, from the late 1970s until the early 1990s, Rhee Bros.' Soon Chang gochujang products may very well have been the only gochujang products in the U.S. Korean foods market. Mr. Rhee testified that he genuinely believed, albeit mistakenly, that gochujang consumers associated the term Soon Chang with his gochujang due to the longevity of his products' presence in the Korean food market in the U.S. *Rhee Dep. at 59-60*.

As I previously stated, I do not credit Rhee Bros.' denial of knowledge regarding Soon Chang's reputation for high quality gochujang for purposes of determining the validity

of the instant trademark. However, I do not find that Mr. Rhee had utterly no basis to believe that his products had created secondary meaning to replace the goods-place association of Soon Chang gochujang. The lack of secondary meaning evidence arises from Rhee Bros.' failure to disclose the goods-place association of Soon Chang to the PTO, and thus the PTO failure to request evidence of secondary meaning in the instant trademark (although it did request it in response to the refiled Amberly application). These circumstances do not show, notwithstanding my conclusion, that Rhee Bros. was convinced that secondary meaning did not exist or could not be shown. *See Macklin*, 639 A.2d at 119 ("whether particular conduct is proper or improper is a factual question to be determined on the basis of all the facts and circumstances") (citing *Natural Design*, 485 A.2d at 675).

Furthermore, Rhee Bros.' suit to enforce its mark, irrespective of the mark's validity or Rhee Bros.' belief in its validity, was not a proximate cause of harm to Daesang's economic relationship with Han Ah Reum. In order to succeed on a wrongful interference action, Daesang must prove that Rhee Bros.' wrongful act, e.g. the trademark infringement suit, caused the destruction of the business relationship between Daesang and Han Ah Reum. *Medical Mutual Liability*, 660 A.2d at 439. Daesang alleges that but for this lawsuit, Daesang's Chapssal and Chal Soon Chang gochujang products would still be sold in Han Ah Reum's supermarkets.[12] However, this contention fails to appreciate Han Ah Reum's independent decision to settle the suit rather than challenge it in court. It was Han Ah

___

[12]The consent decree and settlement agreement with Han Ah Reum prohibits only the sale of Soon Chang Chopssal and Chal gochujang.  *Plf. Exhs. 45, 75*.

Reum's decision to agree to the Settlement Agreement and Consent Decree, with the assistance of competent counsel, that led to the removal of Daesang's products from Han Ah Reum's shelves.  Han Ah Reum's decision to settle came about after its attorneys had more than a year to assess Rhee Bros.' claims, take discovery, and engage in settlement discussions with Rhee Bros.' counsel.  *Plf. Exh. 35*.  If the suit was indeed as groundless as Daesang alleges, Han Ah Reum would have refused to settle and continued to sell Daesang's gochujang products.

Equally telling, Daesang could have intervened in the lawsuit as a means of protecting its rights rather than wait two years to file this suit.  A timely intervention would likely have prevented the harm to Daesang's economic relations with Han Ah Reum and, more importantly, would have exposed the groundlessness in the suit, if it was indeed as groundless as Daesang alleges.  Therefore, as a matter of fact and law, Han Ah Reum's independent decision to settle the litigation, along with Daesang's failure to intervene in the suit, was the proximate cause of Daesang's injury in no longer having Daesang Chapssal Soon Chang and Chal Soon Chang gochujang products sold in Han Ah Reum stores.

> C.    This is not an Exceptional Case, and Thus, Plaintiff's Request for Attorney's Fees and Costs Shall be Denied

Section 35(a) of the Lanham Act provides that a court may award attorney's fees to the prevailing party in "exceptional cases."  15 U.S.C. § 1117(a).  An award of attorney's fees is equally available to prevailing plaintiffs and defendants. *The Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 599 (4th Cir. 1992) (noting that a finding of bad

faith on the part of a plaintiff is not necessary for a prevailing defendant to prove an "exceptional" case, yet a prevailing plaintiff must show the defendant acted in bad faith). A case is exceptional when the conduct of the losing party is "malicious, fraudulent, deliberate, and willful." *Id*. at 600. Other factors to be considered in determining whether a case is exceptional include economic coercion, groundless arguments, and failure to cite controlling law. *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 144 (4th Cir. 2000).

A defendant may be awarded attorney's fees where the plaintiff fraudulently obtains federal trademark registrations "for the purpose of instituting vexatious litigation" and causes defendants to incur significant costs in defending against it. *Orient Express Trading, Co., Ltd. v. Federated Dep't Stores, Inc.*, 2 U.S.P.Q.2d 1106, 1119 (S.D.N.Y.), *modified in part on recons.*, 3 U.S.P.Q.2d 1387 (S.D.N.Y. 1987). However, the good faith, but ultimately unsuccessful, assertion of a questionable claim or controversial legal theory does not suffice to warrant an award of attorney's fees, even if it turns out to be expensive for the prevailing party. *People for Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001) (concluding that defendant who had acted in "bad faith" for purposes of the Anticybersquatting Consumer Protection Act was not liable for attorney's fees because the conduct did not rise to the level of "malicious, fraudulent, willful or deliberate" because defendant had a genuine belief that he had a right to use the mark). Consequently, courts often focus on the plaintiff's litigation conduct or pre-litigation assertion of rights and view the plaintiff's assertion of rights as a whole as opposed to looking at "snippets" of the record. *Retail Svcs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 551 (4th Cir. 2004).

Despite my finding that Rhee Bros.' mark is invalid, I do not find that Rhee Bros.' attempts to enforce its mark were attended with the level of malice and bad faith required to qualify this case as "exceptional." As I stated previously, Rhee Bros. has not acted wholly without a colorable basis to have believed, although mistakenly, that its Soon Chang mark was valid; i.e., the longevity of its gochujang product sales in the U.S.[13] Although Mr. Rhee's incredible testimony[14] seriously undermines his claims of ignorance regarding Soon Chang's goods-place association with gochujang, it is not categorically unreasonable for an entrepreneur whose products have pervaded the U.S. market for 15 years to believe that his product name has created secondary meaning to the goods-place association.

Moreover, Rhee Bros.' attempt to enforce the trademark against others, including Han Ah Reum and Seoul Shik Poom, undermines Daesang's allegations that Rhee Bros.' enforcement effort against Daesang was malicious or vexatious. Rhee Bros. did not target Daesang by overlooking every other competitor using Soon Chang on its gochujang labels.[15]

_____

[13]Daesang has failed to rebut Rhee Bros.' evidence of its exclusive and continuous use of Soon Chang for gochujang products sold in the United States from 1978 to 1992. *Tr. At 158.*

[14]Mr. Rhee's reliance on *A 35 Year History of Bean Paste Association* and his underlining of the section identifying Soon Chang's fame for gochujang attests to his knowledge of such facts. *Tr. at 218-19, 144-48.* Moreover, Rhee Bros.' advertisements of their Soon Chang gochujang products referred to "Soon Chang, the historical traditional way of the past, the way it was before," referring to a period when Soon Chang was homemade for many centuries prior to the industrialization of the production process. *Plf. Exhs. 99-100.* Mr. Rhee was also aware as far back as the late 1970s of a company named Tobaki Soon Chang Sikpum located in Soon Chang, Korea, that manufactured gochujang. *Tr. At 151-52.*

[15]A trademark owner need not prosecute *every* infringer, as long as the owner is reasonably diligent in his enforcement efforts. *Quality Inns Int'l, Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 214 (D. Md. 1988); J. Thomas McCarthy, *Trademarks and Unfair Competition* §
(continued...)

Notably, Rhee Bros.' suit against Han Ah Reum resulted in a settlement agreement voluntarily entered into by Han Ah Reum.  The willingness of a sophisticated corporation, equipped with competent counsel, to settle a trademark infringement claim undermines Daesang's claim that Rhee Bros.' contentions in defending its mark were completely groundless. Finally, Rhee Bros. received its first trademark for Soon Chang in 1987 and applied for a second registration in 1994 in consequence of its former lawyer's failure to file a Section 8 affidavit, causing the first to be cancelled. Therefore, Rhee Bros. did not obtain a trademark for the sole purpose of instituting vexatious litigation against Daesang.

Upon my consideration of the factual record in its entirety, I do not find this case to be "exceptional" as defined in 15 U.S.C. § 1117(a), and thus I shall deny Daesang's request for attorneys' fees and costs.

III.   CONCLUSION

On the basis of the findings and conclusions set forth above, an Order shall issue declaring: (1) Daesang's use of Soon Chang or its Korean equivalent does not constitute trademark infringement, dilution, or unfair competition, and does not violate any state or federal laws or common laws; (2) Daesang's use of Soon Chang is fair use within the meaning of 15 U.S.C. § 1115(b)(4) and creates no likelihood of confusion; (3) Rhee Bros. has never established any trademark or  exclusive rights in the geographical name Soon Chang (its alleged mark) because as this name is used by Rhee Bros., (a) it is deceptive and

---

[15](...continued)
17:17 (4th ed. 2004).

thus barred from protection under 15 U.S.C. § 1052(a); (b) it is primarily geographically deceptively misdescriptive and thus barred from protection under 15 U.S.C. § 1052(e)(3); and (4) enjoining Rhee Bros. from interfering with Daesang's use of Soon Chang on gochujang products manufactured in Soon Chang.

Filed: May 13, 2005                               _____/s/_____

                                                  Andre M. Davis
                                                  United States District Judge